## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy Case No. 16 B 29319 |
| | ) | |
| CONSTANTINO JOSEPH BOCCARSI | ) | Chapter 7 |
| CARI ANN COGLIANESE, | ) | |
| | ) | |
| Debtors. | ) | Honorable Janet S. Baer |
| ———————————————————— | ) | |
| | ) | |
| MARK SIMON, | ) | Adversary Case No. 17 A 00176 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CONSTANTINO JOSEPH BOCCARSI | ) | |
| CARI ANN COGLIANESE, | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————————— | ) | |

## MEMORANDUM OPINION

Mark Simon filed an adversary complaint against Constantino Joseph Boccarsi and Cari Ann

Coglianese (the "Debtors"), seeking a determination that a judgment debt owed to him by the

Debtors is not dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(19).[1] This matter

is now before the Court on Simon's motion for summary judgment on his securities fraud claim

under § 523(a)(19).[2] For the reasons set forth below, the Court finds that there are no genuine issues

---

[1] Unless otherwise noted, all statutory and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101 to 1532, and the Federal Rules of Bankruptcy Procedure.

[2] Although captioned a "motion for summary judgment," the matter at bar is technically a motion for partial summary judgment because it relates only to Simon's securities fraud claim. Because judgment will be entered in Simon's favor on that claim, the other claims in the complaint are rendered moot.

of material fact and that Simon is entitled to judgment as a matter of law on the securities fraud

claim. As such, Simon's motion will be granted, and judgment will be entered in his favor.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and Internal

Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.

This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

## BACKGROUND

The material facts in this case are undisputed. Those facts, gleaned from the docket, the

pleadings, and the summary judgment statements and responses, as well as the exhibits attached

thereto, are as follows.

On May 16, 2008, Simon filed a verified complaint against the Debtors and others in the

Superior Court of the State of Arizona (the "state court"). (Defs.' L.R. 7056-2 Resp. ¶ 2.) Among

the other defendants named in the complaint were Allen J. White ("White"), an attorney for and

officer of Simon's Arizona-based mortgage company GD Financial Services of Arizona, Inc. ("GD

Financial"); his wife Vicki White; and L.T. Fortune Capital, Inc. ("LTF"), an Illinois corporation of

which Boccarsi is the principal shareholder.[3] (*Id.* at Ex. A1 ¶¶ 4, 6, 11.)

According to the state court complaint, Boccarsi approached Simon in May 2006 at the

offices of GD Financial regarding an investment opportunity in a "unique" stock trading program.[4]

(*Id.* at Ex. A1 ¶ 10.) Specifically, Simon alleged that Boccarsi told him that the stock trading

---

[3] L.T. Fortune Capital, Inc. was formerly known as LT Investment Capital, LLC, a limited liability company of which Boccarsi was the principal member. (Defs.' L.R. 7056-2 Resp. at Ex. A1 ¶ 6.) For the sake of simplicity, the Court will refer to both L.T. Fortune Capital, Inc. and LT Investment Capital, LLC as "LTF."

[4] Boccarsi was an employee of GD Financial at the time in question. (Defs.' L.R. 7056-2(A)(2)(b) Additional Facts § 16.)

program had "never had a losing trading day," that "no investor had ever lost any money" in the

program, and that participation in the program "enabled investors to realize lucrative short-term

profits." (*Id.*) The state court complaint additionally alleged the following:

*     White called Simon on three or four different occasions in May 2006 to encourage him to participate in the stock trading program.[5] (*Id.* at ¶ 11.)

*     White subsequently prepared an investor agreement (the "Investor Agreement") for Simon to execute in order to take part in the program. (*Id.*) The Investor Agreement included various statements about investment advisory services, accredited investors, statutory exemptions from registration, and investment activity reports. (*Id.*) White assured Simon that he had drafted the Agreement to "protect everyone." (*Id.* at ¶ 12.)

*     Based on the statements made by Boccarsi and White, on May 22, 2006, Simon transferred $100,000 to Boccarsi so that Simon could participate in the stock trading program. (*Id.* at ¶ 13.)

*     Shortly thereafter, Boccarsi told Simon that an additional $100,000 transfer was required under the Investor Agreement and reassured Simon of the program's "inherent success."[6] (*Id.* at ¶ 14.) Based on these representations, Simon transferred the additional $100,000 to Boccarsi.[7] (*Id.*)

*     Boccarsi was not an investment advisor, he did not invest Simon's funds in the stock trading program as he told Simon he would, and, indeed, he did not have access to any such program as he represented he did. (*Id.* at ¶ 15.)

---

[5] Simon alleged in his adversary complaint that White acted on behalf of Boccarsi with respect to all factual allegations in the complaint. (Adv. Compl. § 10.)

[6] According to the state court complaint, Boccarsi told Simon that he would be in breach of the Investor Agreement unless he transferred the additional $100,000. (Defs.' L.R. 7056-2 Resp. ¶ 14.)

[7] The dates of the transfers in Simon's adversary complaint differ from those in the state court complaint. According to the adversary complaint, Simon wired the first $100,000 into a Fifth Third Bank account owned by Boccarsi's company LTF on May 25 and the second $100,000 into the same account on May 26. (Adv. Compl. ¶¶ 25 & 26.) Simon also alleged in the adversary complaint that on June 8 Boccarsi wired $200,000 out of the LTF account and into his personal trading account at Forex Capital Markets, an online foreign exchange market broker. (*Id.* at ¶ 27.) The year for each of these dates is identified as 2016 instead of 2006, clearly a typographical error on Simon's part. In any event, the discrepancies in the dates of the transfers are not material to the Court's nondischargeability determination in this matter.

*     Simon demanded the return of his money in February 2007.[8]  (*Id.* at ¶ 16.)

*     In response, Boccarsi told Simon that, due to trading losses, there was only $37,000 remaining in Boccarsi's foreign exchange trading account from Simon's initial investment. (*Id.;* Defs.' L.R. 7056-2(A)(2)(b) Additional Facts ¶ 12.)

*     Boccarsi ultimately returned $34,000 to Simon in mid-2007.[9] (Defs.' L.R. 7056-2 Resp. at Ex. A1 ¶ 16.)

Based on the allegations in the state court complaint, Simon sought damages against Boccarsi in five counts: (1) securities fraud and violation of § 44-1991 of the Arizona Revised Statutes (fraud in purchase or sale of securities), Ariz. Rev. Stat. § 44-1991; (2) fraud; (3) negligent misrepresentation; (4) violation of § 44-1841 of the Arizona Revised Statutes (sale of unregistered securities prohibited), Ariz. Rev. Stat. § 44-1841; and (5) violation of § 44-1842 of the Arizona Revised Statutes (transactions by unregistered dealers and salesmen prohibited), Ariz. Rev. Stat. § 44-1842.[10] (Defs.' L.R. 7056-2 Resp. ¶ 5 & Ex. A1 ¶¶ 17-55.)

---

[8] Simon alleged in his adversary complaint that he first demanded return of the funds in October 2006. (Adv. Compl. ¶ 19.) An email message attached as an exhibit to Simon's response to the Debtors' additional facts shows that Simon's wife Maureen demanded return of the money no later than January 31, 2007. (Pl.'s Resp. to Defs.' L.R. 7056-2(A)(2)(b) Additional Facts at Ex. G.) As above, the discrepancy as to when Simon first requested return of his money is immaterial to the issue at bar.

[9] Simon alleged in his adversary complaint that Boccarsi returned only $30,000. (Adv. Compl. ¶ 24.) In his response to the Debtors' additional facts, however, Simon subsequently claimed that Boccarsi returned $33,000. (Pl.'s Resp. to Defs.' L.R. 7056-2(A)(2)(b) Additional Facts ¶ 12.) In support of that contention, Simon attached, as exhibits, a check dated October 5, 2006, payable to him from LTF, in the amount of $3,000 and a transaction report from Fifth Third Bank showing a transfer from LTF to Simon in the amount of $30,000. (*Id.* at Exs. B & C.) The default judgment eventually entered by the state court also reflects that the amount returned to Simon totaled $33,000. (*See* Pl.'s L.R. 7056-1 Stmt. at Exs. E & F.) Boccarsi alleged that he returned $37,000 to Simon. (Defs.' L.R. 7056-2(A)(2)(b) Additional Facts ¶ 12.) As discussed *infra*, the total returned and the amount due and owing under the default judgment are irrelevant to the Court's decision in this matter.

[10] Section 44-1991 of the Arizona Revised Statutes provides in relevant part as follows:

> It is a fraudulent practice and unlawful for a person, in connection with a transaction or transactions within or from this state involving an offer to sell or buy securities, or a sale or purchase of securities, . . . directly or indirectly to do any of the following:
>
> 1.   Employ any device, scheme or artifice to defraud.

4

On September 25, 2008, the state court dismissed Counts 4 and 5 of the complaint. (*Id.* at ¶ 6; Pl.'s L.R. 7056-1 Stmt. at Ex. D.) According to the court's "minute entry" on that date, those counts were dismissed by agreement of the parties because they were barred by "an applicable statute of limitations." (Pl.'s L.R. 7056-1 Stmt. at Ex. D.)

About eight months later, on May 15, 2009, counsel for the Debtors and LTF filed a motion to withdraw as attorneys of record because the Debtors and LTF had allegedly failed "to meet their obligations" to the law firm. (Defs.' L.R. 7056-2 Resp. at Ex. A5.) The attorneys certified in their motion that the Debtors and LTF had been notified of the status of the case, including the dates and times of any court hearings, the need to comply with court orders, and the possibility of sanctions for non-compliance. (*Id.*) The attorneys also stated that the Debtors and LTF had been informed that it was "incumbent upon them to retain other counsel or to represent themselves" in a *pro se* capacity in connection with any further proceedings. (*Id.*) The state court subsequently granted counsel's motion to withdraw. (*Id.* at Exs. A2 & A5.)

On May 28, 2010, White and his wife (together, the "Whites") filed a motion for summary judgment in the state court case. (Defs.' Resp. at 3; *see also* Defs.' L.R. 7056-2 Resp. at Ex. A2.) According to the Debtors, the state court judge ordered that they attend the hearing. (Defs.' Resp. at 3.) When they failed to do so, the state court struck the answer that they had previously filed. (*Id.*) On November 24, 2010, the court entered a default judgment in Simon's favor and against the

---

2.   Make any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

3.   Engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit.

Ariz. Rev. Stat. § 44-1991.

Debtors and LTF in the principal amount of $167,000, together with pre-judgment interest of

$76,359, with interest continuing to accrue on the entire judgment of $243,359 at the statutory rate

of 10% per annum until paid in full. (*Id.*; Defs.' L.R. 7056-2 Resp. ¶ 7; Pl.'s L.R. 7056-1 Stmt. at

Ex. E.)

On May 19, 2011, the state court entered an amended judgment in favor of Simon and against

the Debtors and LTF. (Defs.' L.R. 7056-2 Resp. ¶ 8; *see also* Pl.'s 7056-1 Stmt. at Ex. F.) The only

change in the amended judgment was the addition of language stating that the judgment was final.

(*Id.*)

Shortly thereafter, on May 27, 2011, the Debtors and LTF filed a motion for relief from the

default judgment. (Defs.' L.R. 7056-2 Resp. at Ex. A6.) According to the motion, the failure of the

Debtors and LTF to appear at the hearing on the Whites' motion for summary judgment as ordered

was the result of "inadvertence" and "excusable neglect." (*Id.* at 1-3.) Specifically, the Debtors

claimed that they and LTF did not attend the hearing because it "did not necessarily involve" them

and they could not afford to either hire an attorney to represent them or travel from Illinois to

Arizona to represent themselves. (*Id.* at 2-3.) After the motion for relief was fully briefed, the state

court recorded a minute entry denying the motion.  (Pl.'s Reply at Ex. A.) The Debtors and LTF

did not file an appeal.

On June 27, 2011, Simon and the Whites participated in a settlement conference through

which they were able to resolve their disputes.  Subsequently, on July 13, 2011, Simon and the

Whites executed a "Settlement Agreement and Release" (the "Settlement Agreement"), whereby a

stipulation to dismiss the claims against the Whites, with prejudice, was filed in the state court case

6

in exchange for a "Settlement Amount" paid by the Whites to Simon and his wife Maureen.[11] The

Settlement Agreement was produced for review by the Debtors pursuant to an agreed protective

order entered on August 17, 2017.[12] (*See* Agreed Protective Order, Adv. No. 17-00176, Docket No.

31.) There is no provision in the Agreement releasing the Debtors from the state court judgment.

On February 23, 2016, counsel for Maureen Simon filed a petition to register the amended

default judgment in the Circuit Court of Cook County (the "Cook County Court"). (Defs.' L.R.

7056-2 Resp. at Ex. A8.) About two weeks later, on March 8, 2016, Simon filed in the Arizona state

court an "Affidavit of Renewal of Amended Judgment," which reflected the original amended

judgment amount of $243,359 and added post-judgment interest of $117,012.34, for a total judgment

of $360,371.34 as of the date of the entry of the affidavit. (Defs.' L.R. 7056-2(A)(2)(b) Additional

Facts ¶ 14; Defs.' L.R. 7056-2 Resp. at Ex. A4.)

About six months later, on September 14, 2016, the Debtors filed a voluntary petition for

relief under chapter 7. (Bankr. No. 16-29319, Docket No. 1.) On their schedule E/F, they listed

Simon as a creditor with an unsecured claim of $359,437. (*Id.* at Docket No. 13.) Their schedule

---

[11] The Settlement Agreement was also executed by Maureen Simon. According to the document, although Maureen was not a party to the state court litigation, she acknowledged, by executing the Settlement Agreement, that she did not have nor would she ever have any claims against the Whites or any other parties subject to the Agreement.

[12] In response to Simon's motion for summary judgment, the Debtors argued that the Settlement Agreement may have also released them from the default judgment entered by the state court and requested that Simon turn over the document for their review. (Defs.' Resp. at 9; Mot. for Protective Order, Adv. No. 17-00176, Docket No. 27 (hereafter, "Mot. for Protective Order"), at 2.) Simon replied by explaining that the Settlement Agreement was subject to a confidentiality provision and, thus, could not be turned over. (Pl.'s Reply at 7-8; Mot. for Protective Order at 2.) Although Simon subsequently submitted the document to the Court *in camera*, the Debtors argued that summary judgment cannot be based on an *in camera* review. (Defs.' Surreply at 3-4; Mot. for Protective Order at 2.) Accordingly, Simon's attorney called White to request permission to disclose the Settlement Agreement to the Debtors, but White refused to speak to him. (Mot. for Protective Order at 2). As a result, Simon filed a motion for a protective order covering the Settlement Agreement and subsequently produced the document confidentially for the Debtors' review.

I reflects a $750 monthly garnishment to Simon from Coglianese's income, and their statement of financial affairs includes the judgment currently pending in the Cook County Court. (*Id.* at Docket Nos. 13 & 15.)

On April 4, 2017, Simon filed an adversary complaint against the Debtors, seeking a determination that the judgment debt is excepted from discharge pursuant to §§ 523(a)(2)(A), (a)(4), and (a)(19). (Adv. No. 17-00176, Docket No. 1.) The Debtors' answer to the complaint was due on or before May 4, 2017. (*See id.* at Docket No. 2.) No answer was filed.

On May 2, 2017, Simon filed the instant motion for summary judgment on the securities fraud claim under § 523(a)(19). (*Id.* at Docket No. 7.) After the motion was fully briefed, the Court took the matter under advisement. Having reviewed all of the relevant documents, exhibits, and arguments, as well as the applicable case law, the Court is now ready to rule.

## SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be brought by a party at any time. *See* Fed. R. Civ. P. 56(b) (made applicable to adversary proceedings by Fed. R. Bankr. P. 7056). Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The primary purpose of the summary judgment procedure is to avoid unnecessary trials where no genuine issues of material fact are in dispute. *See Trautvetter v. Quick*, 916 F.2d 1140, 1147 (7th Cir. 1990); *Farries v. Stanadyne/Chi. Div.*, 832 F.2d 374, 378 (7th Cir. 1987) (quoting *Wainwright Bank & Trust Co. v. Railroadmens Fed. Sav. & Loan Ass'n of Indianapolis*, 806 F.2d 146, 149 (7th Cir. 1986)). Thus, on a motion for summary judgment, the Court must decide, based on the evidence, whether there is a material disputed fact that requires a trial. *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 507 (7th Cir. 2010); *Payne v.*

*Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where the material facts are not in dispute, the only issue is whether the moving party is entitled to judgment as a matter of law. *ANR Advance Transp. Co. v. Int'l Bhd. of Teamsters, Local 710*, 153 F.3d 774, 777 (7th Cir. 1998).

The party seeking summary judgment always bears the burden of establishing that there are no genuine issues of material fact in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether the movant has met his burden, the Court must view all reasonable inferences drawn from the underlying facts in a light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 248; *Smeigh v. Johns Manville, Inc.*, 643 F.3d 554, 560 (7th Cir. 2011). Once the moving party satisfies his initial burden of production, the party opposing the motion may not rest on the mere allegations or denials in his pleadings; rather, his response must set forth specific facts demonstrating that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 248; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001).

A careful review of the parties' statements and responses filed in connection with Simon's motion for summary judgment reveals that there are no genuine material facts in dispute.[13] Thus, the only question to be considered is whether Simon is entitled to summary judgment as a matter of law.

---

[13] The facts in dispute in the parties' statements and responses are immaterial to the determination to be made by the Court.

## DISCUSSION

Simon's motion for summary judgment is based on § 523(a)(19), which excepts from discharge those debts arising from securities law violations or common law fraud in connection with the purchase or sale of a security. A debt is not dischargeable under § 523(a)(19) if the debt–

    (A) is for–

        (i) the violation of any of the Federal securities laws . . ., any of the State securities laws, or any regulation or order issued under such Federal or State securities laws; or

        (ii) common law fraud, deceit, or manipulation in connection with the purchase or sale of any security; and

    (B) results, before, on, or after the date on which the petition was filed, from–

        (i) any judgment, order, consent order, or decree entered in any Federal or State judicial or administrative proceeding;

        (ii) any settlement agreement entered into by the debtor; or

        (iii) any court or administrative order for any damages, fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor.

11 U.S.C. § 523(a)(19). To succeed on a claim for nondischargeability under § 523(a)(19), an objecting creditor must establish that: (1) the debt stems from a violation of federal or state securities laws or common law fraud in connection with the purchase or sale of a security; and (2) the debt is memorialized in a judicial or administrative order or in a settlement agreement. 11 U.S.C. § 523(a)(19); *Bryant v. Clements (In re Clements)*, Case No. 16-13848-7, Adv. No. 17-12, 2017 WL 3207767, at *4 (Bankr. W.D. Wis. July 27, 2017).

Section 523(a)(19) was added to the Bankruptcy Code in the wake of the Enron collapse as part of the Sarbanes-Oxley Act of 2002. *See* S. Rep. No. 107-146, at 2-10 (2002). The primary

purpose of the statute was to amend the Code "to make judgments and settlements arising from state

and federal securities law violations brought by state or federal regulators and private individuals

non-dischargeable," thus "protecting victims' ability to recover their losses." *Id.* at 12, 16; 148

Cong. Rec. S7418-01, at S7418 (daily ed. July 26, 2002) (statement of Senator Leahy). In particular,

Congress intended, through § 523(a)(19), to obviate the need of securities regulators and investors

to relitigate "securities law violations in the bankruptcy court in order to protect securities-related

judgments and settlements from discharge." *Kokas v. Osborne (In re Osborne)*, Case No. 16-40903,

Adv. No. 16-4068, 2017 WL 1232407, at *4 (Bankr. E.D. Tex. Apr. 3, 2017). That intent is

demonstrated by the legislative history of § 523(a)(19):

> Current bankruptcy law may permit . . . wrongdoers to discharge their
> obligations under court judgments or settlements based on securities fraud
> and other securities violations. This loophole in the law should be closed to
> help defrauded investors recoup their losses and to hold accountable those
> who violate securities laws after a government unit or private suit results in
> a judgement or settlement against the wrongdoer. This provision is meant to
> prevent wrongdoers from using the bankruptcy laws as a shield and to allow
> defrauded investors to recover as much as possible.

* * *

> Under current laws, state regulators are often forced to "reprove" their fraud
> cases in bankruptcy court to prevent discharge because remedial statutes often
> have different technical elements than the analogous common law causes of
> action. . . . In short, with their resources already stretched to the breaking
> point, state regulators must plow the same ground twice in securities fraud
> cases. By ensuring securities law judgments and settlements in state cases are
> non-dischargeable, precious state enforcement resources will be preserved
> and directed at preventing fraud in the first place.

148 Cong. Rec. S7418-01, S7419 (daily ed. July 26, 2002) (statement of Senator Leahy).

### 1.    Section § 523(a)(19)

With the elements and purposes of § 523(a)(19) firmly in mind, the Court now turns to the

11

parties' claims. Simon argues that the state court judgment he obtained against the Debtors was for securities fraud. Thus, Simon says, collateral estoppel should bar the relitigation of his claim. The Debtors disagree. They contend that neither element required under § 523(a)(19) has been satisfied. According to the Debtors, they did not commit securities fraud and the fact that the state court judgment was entered in default insulates the judgment from a finding of nondischargeability. The Court will address each of the elements in turn.

### A. Debt for Violation of Securities Laws or Common Law Fraud in Connection with the Purchase or Sale of a Security

Challenging the state court judgment on the merits, the Debtors argue that they did not violate securities law or commit fraud in connection with the purchase or sale of a security. According to the Debtors, they were unable to actually litigate and prove that they were not liable, because the state court struck their answer as a sanction for failing to appear at the Whites' summary judgment hearing. Explaining their absence at that hearing, the Debtors claim that they had no funds to continue their defense and that they were unaware of the consequences of failing to defend.

Despite these "explanations," the Debtors had a full and fair opportunity to litigate. They initially appeared through counsel at various hearings and also filed an answer. By failing to defend after their counsel withdrew, the Debtors defaulted–a fact that they concede.[14] *See Ackra Direct Mktg. Corp. v. Fingerhut Corp.*, 86 F.3d 852, 854-57 (8th Cir. 1996) (upholding default judgment against defendants under similar circumstances).

"After a default judgment is handed down, a defendant admits to a complaint's well-pleaded

---

[14] Prior to withdrawing, Debtors' counsel notified the Debtors of the status of the case, advised them of the importance of complying with court orders, and warned them of the possibility of sanctions for non-compliance. Thus, the Debtors' claim that they were unaware of the consequences of failing to appear at the Whites' summary judgment hearing or otherwise defending themselves is unconvincing.

facts and forfeits his or her ability to contest those facts." *Clements*, 2017 WL 3207767, at *3.

Accordingly, by defaulting, the Debtors relieved Simon of having to prove the factual allegations

in the state court complaint. *See id.*

Attacking the state court judgment from another angle, the Debtors also argue that the debt

at issue is not for the violation of securities laws or for common law fraud in connection with the

purchase or sale of a security, because the default judgment did not contain any findings establishing

the causes of action under which it was entered. The Court rejects this argument as disingenuous.

True, the state court judgment neither contains particularized findings nor names the causes

of action under which it was entered. It is beyond dispute, however, that the judgment was entered

after the state court struck the Debtors' answer and found them to be in default and, therefore, liable

to Simon for damages resulting from a violation of state securities laws, common law fraud, and

negligent misrepresentation, the three counts remaining in the complaint at the time of the

judgment's entry. Although the Debtors refute the facts in connection with these causes of action,

the judgment was a final order, and the Debtors did not file an appeal.

Further, the state court judgment was entered based solely on the Debtors' failure to appear

at a hearing on the Whites' motion for summary judgment. For that failure, the state court struck

the Debtors' answer and found them in default. Factual findings are not typically made when there

is a no-answer default judgment. *ColeMichael Invs., L.L.C. v. Burke*, 436 B.R. 53, 63 (N.D. Ill.

2010).

Despite the lack of factual findings in the default judgment itself, the pleadings provide a

sufficient basis to support the judgment. *See Meyer v. Rigdon*, 36 F.3d 1375, 1382-85 (7th Cir.

1994) (looking to the text of the complaint in a default context to determine if findings necessary for

13

nondischargeability were sufficiently pled); *see also Clements,* 2017 WL 3207767, at *3; *Voss v. Pujdak (In re Pujdak)*, 462 B.R. 560, 577 (Bankr. D.S.C. 2011). The state court complaint alleged a violation of state securities law in the purchase or sale of securities, as well as common law fraud in connection therewith. (*See* Compl. in Defs.' L.R. 7056-2 Resp. at Ex. A1.) Specifically, Simon set out a number of facts establishing that Boccarsi, at a minimum, participated in the offering of the stock to Simon. (*See id.*) These facts and others support Simon's allegations, deemed true after default, and "form the basis for a cognizable claim" of state securities fraud. *See Clements,* 2017 WL 3207767, at *3. Thus, the Court finds that Simon sufficiently alleged the requirements for causes of action for violation of § 44-1991 of the Arizona Revised Statutes and for common law fraud in connection with the purchase or sale of a security. Accordingly, the first element of § 523(a)(19) has been satisfied.

## B. Preclusive Effect of State Court Default Judgment

Next, the Debtors argue that the second element of § 523(a)(19) has not been satisfied because the state court judgment was entered in default and, thus, the issues were not "actually litigated." As a result, the Debtors claim, collateral estoppel cannot be applied, and the state court judgment is not preclusive.

Bankruptcy courts ordinarily make independent decisions as to whether debts are nondischargeable under the various provisions of § 523(a). *See Meyer*, 36 F.3d at 1378. It is well established, however, that the doctrine of collateral estoppel, or issue preclusion, applies in bankruptcy discharge exception proceedings. *Grogan v. Garner*, 498 U.S. 279, 284 n.11 (1991); *Klingman v. Levinson*, 831 F.2d 1292, 1294-95 (7th Cir. 1987). Accordingly, "if a court of competent jurisdiction has previously entered judgment against [a] debtor" for violation of securities

14

laws or for common law fraud in connection with the purchase or sale of a security, "the debtor may

not relitigate the underlying facts in the bankruptcy court." *See Meyer*, 36 F.3d at 1378.

Where a prior judgment was issued by a state court, the collateral estoppel of that state

governs. *Brokaw v. Weaver*, 305 F.3d 660, 669 (7th Cir. 2002); *see also Filian v. Jansma (In re

Jansma)*, Bankr. No. 09 B 7071, Adv. No. 09 A 00444, 2010 WL 2742908, at *8 (Bankr. N.D. Ill.

July 8, 2010) (explaining that "[w]hen a federal court gives collateral estoppel effect to a state

court's determinations," the federal court must "apply collateral estoppel as the courts of that state

would apply it"). Because the judgment against the Debtors was entered in an Arizona state court,

the Arizona law of collateral estoppel applies. The elements of collateral estoppel under Arizona

law are: "(1) the parties actually litigated the issue in the prior proceeding; (2) the parties had a full

and fair opportunity to litigate the issue; (3) the issue's resolution was essential to the decision; (4)

the court entered a valid final decision on the merits; and (5) a common identity of parties exists."

*Calpine Constr. Fin. Co. v. Ariz. Dep't. of Revenue*, 211 P.3d 1228, 1233 (Ariz. Ct. App. 2009).

As the Debtors correctly claim, a default judgment is typically not given preclusive effect

under the doctrine of collateral estoppel because no issue has been "actually litigated." *Meyer*, 36

F.3d at 1379; *Frankfurt v. Friedman (In re Friedman)*, 531 B.R. 741, 746 (Bankr. N.D. Ill. 2015);

*Herbstein v. Bruetman (In re Bruetman)*, 259 B.R. 649, 663 (Bankr. N.D. Ill. 2001). Section

523(a)(19), however, changes the usual collateral estoppel rules. *Friedman*, 531 B.R. at 746.

According to the plain language of the statutory exception, a debt for "the violation of *any* ... State

securities laws ... or [for] common law fraud ... in connection with the purchase or sale of *any*

security" that results from "*any* judgment, order, consent order, or decree entered in *any* ... State

judicial or administrative proceeding" is not dischargeable. 11 U.S.C. § 523(a)(19) (emphasis

15

added).

Examining the preclusive effect of a non-bankruptcy court judgment in an action based on

§ 523(a)(11), a statute with very similar language, the Seventh Circuit held that Congress preempted

the common law doctrine of collateral estoppel by enacting that statutory exception.[15] *Meyer*, 36

F.3d at 1379-80. In *Meyer*, the court found that "[t]he plain language of section 523(a)(11) requires

the bankruptcy court [to] give preclusive effect to dispositions, like default judgments (a default

judgment is *any* judgment) . . ., that would not be given preclusive effect under the common law."

*Id.* at 1380. Thus, the court concluded that, in enacting § 523(a)(11), Congress' intent was to

preempt collateral estoppel under the common law by "expand[ing] the preclusive effect given [to]

certain prior actions in bankruptcy discharge exception proceedings." *Id.* at 1379-80. Ultimately,

the *Meyer* court found that default judgments can have preclusive effect in nondischargeability

actions "because § 523(a)(11) preempted common law collateral estoppel, which requires that the

underlying claim be '"actually litigated.'" *Pujdak*, 462 B.R. at 576 (discussing *Meyer*).

The reasoning of *Meyer* is equally applicable to nondischargeability actions under §

523(a)(19). Given that reasoning, along with the plain language of the statutory exception and

Congress' intent to protect victims of securities fraud and to prevent securities regulators and

investors from having to relitigate securities law violations in the bankruptcy court, "preclusive

---

[15] Section 523(a)(11) provides an exception to discharge for any debt:

> provided in any final judgment, unreviewable order, or consent order or decree entered
> in any court of the United States or of any State, issued by a Federal depository
> institutions regulatory agency, or contained in any settlement agreement entered into by
> the debtor, arising from any act of fraud or defalcation while acting in a fiduciary
> capacity committed with respect to any depository institution or insured credit union[.]

11 U.S.C. § 523(a)(11).

effect must now be given to default judgments before administrative tribunals subject to §

523(a)(19)." *Friedman*, 531 B.R. at 747. Accordingly, collateral estoppel bars the relitigation of

Simon's claim in the bankruptcy court, and the Debtors are precluded from offering a defense here,

notwithstanding the fact that such issues were not actually litigated in the state court.

## 2. The Amount of the State Court Judgment

The Debtors also argue that Simon failed to give them credit for the 2011 settlement with the

Whites. Specifically, the Debtors contend that, in renewing the amended judgment in 2016, Simon

intentionally submitted a false affidavit which failed to reduce the judgment by the amount of the

White settlement. According to the Debtors, Simon's motion for summary judgment should thus

not even be considered because he is seeking to enforce a "fraudulent judgment." This argument is

erroneous and unpersuasive.

By definition, a fraudulent judgment is one "procured by fraud, that is, by perjured allegations

in the complaint in the suit in which the judgment was rendered." *Heiser v. Woodruff*, 327 U.S. 726,

728 (1946). Neither the amended judgment nor Simon's renewal of that judgment was procured by

fraud, and, thus, neither is a fraudulent judgment. A renewal of judgment is, in fact, not a judgment

at all but, instead, a mechanism used to renew and continue "[a] judgment for the payment of money

that has been entered and docketed" in a civil case.[16] Ariz. Rev. Stat. § 12-1612(A); *see also Fid.*

*Nat'l Fin. Inc. v. Friedman*, 238 P.3d 118, 122 (Ariz. 2010).

The strict definition of "fraudulent judgment" aside, the Debtors suggest that the fraud

occurred in Simon's filing of a false affidavit to inflate the balance of the judgment. This argument

---

[16] Under Arizona law, a judgment expires after five years unless it is renewed. *See* Ariz. Rev. Stat. § 12-1612(B); *see also Triple E. Produce Corp. v. Valencia*, 824 P.2d 771, 773 (Ariz. Ct. App. 1991).

is baseless, and, in fact, the chronology of events supports Simon's claim that his failure to credit the settlement payment received from the Whites was simply inadvertent. The amended judgment was entered on May 19, 2011. Subsequently, on July 13, 2011, Simon and the Whites executed the Settlement Agreement. Simon did not file the affidavit of renewal until March 8, 2016, almost five years after the settlement had taken place. Simon's claim that he unintentionally failed to credit the Whites' settlement payment against the judgment is credible. And, in any case, the Court is satisfied that Simon does not intend to collect more than he is owed.

Additionally, Simon's accidental failure to credit the payments neither prevented the judgment from being renewed nor invalidates the judgment or the renewal. "[W]here the amount of [a] balance is incorrectly overstated because of an inadvertent failure to credit a payment made on the judgment, the judgment is then renewed only in the correct amount and, under such circumstances, any interested party [has] the right to correct the judgment on motion and after notice." *Triple E. Produce Corp. v. Valencia*, 824 P.2d 771, 774 (Ariz. Ct. App. 1991); *see also Fay v. Harris*, 164 P.2d 860, 861-62 (1945) (finding that failure to "show the exact balance due" did not defeat renewal). Accordingly, the Debtors may remedy the error in the overstated balance by filing a motion in the Arizona state court.

Finally, the amount of the judgment is irrelevant in this matter because Simon has not requested an award of damages. Rather, he seeks only a declaration that the debt at issue is excepted from discharge. As Simon quite rightly notes, only the existence of the debt matters for purposes of nondischargeability, not its exact amount. The judgment here will simply declare the debt nondischargeable, and the exact dollar amount, including a credit for the settlement payment received from the Whites and any interest, can be determined by the state court.

18

### 3. Release from the State Court Judgment

With one last gasp, the Debtors argue that because the Whites were released under the Settlement Agreement, that Agreement may have also released them from the default judgment entered by the state court. Relying on *Adams v. Dion*, 509 P.2d 201 (Ariz. 1973), the Debtors contend that Arizona law requires this Court to review the Settlement Agreement to determine if it was intended as a release of not only the Whites but also the Debtors. Their reading of *Adams* and Arizona law is not wholly accurate.

In *Adams*, after the plaintiff settled her claim against one of the defendants, the trial court granted summary judgment in favor of the other defendants on the ground that "the release of one joint tortfeasor releases all." *Id.* at 201-02. The plaintiff appealed to the Arizona Supreme Court, asking for the "repudiat[ion] [of] that doctrine." *Id.* at 202. On appeal, the court rejected the doctrine and adopted the rule that "the release of one joint tortfeasor is not a release of any other joint tortfeasors unless the document is intended to release the other tortfeasors, or the payment is full compensation, or the release expressly so provides." *Id.* at 203.

Here, the Settlement Agreement contains no provision, express or otherwise, evidencing an intention to release the Debtors. Nor have the Debtors made a payment to fully compensate Simon. Accordingly, the Settlement Agreement does not release the Debtors from the state court's default judgment.

### CONCLUSION

For the foregoing reasons, the Court finds that the undisputed facts demonstrate that the two requirements of § 523(a)(19) have been satisfied through the entry of the judgment in the state judicial proceeding. The Court further finds that collateral estoppel bars the relitigation of Simon's

19

claim in this Court.  Accordingly, Simon's motion will be granted, and judgment will be entered declaring that the debt at issue is nondischargeable under § 523(a)(19).  As such, the other claims in Simon's adversary complaint are moot and, thus, this Memorandum Opinion resolves the adversary complaint in total.  A separate order will be entered consistent with this Memorandum Opinion.

Dated:  **December 14, 2017**                     ENTERED: _____

Janet S. Baer
United States Bankruptcy Judge